HERMAN J. SELLE, APPELLANT, v. ROBERT WRIGLEY, RESPONDENT.—
135 S. W. (2d) 1045.

Kansas City Court of Appeals.   April 1, 1940.

*McCollum & Ewald* and *Grover C. Sparks* for appellant.

*Breit & Roberts* for respondent.

SHAIN, P. J.—This is an action for damages for wages alleged to be due plaintiff from defendant for services alleged as rendered by plaintiff for defendant for a period of time beginning December 22, 1912, to July 15, 1917. The services are stated as valued at $20 per month and total $1080. Suit was filed October 24, 1935.

The plaintiff in his petition makes allegations as follows:

"That he was a ward of the Children's Aid Society of the City of New York until he was fourteen years of age. That shortly after arriving at the age of fourteen years, and on or about the 8th day of January, 1909, he was placed by said The Children's Aid Society in the home of Margaret Wrigley, of Andrew County, Missouri, under a contract whereby said Margaret Wrigley agreed to keep him in her

home and provide for him until he attained the age of eighteen years. That he became eighteen years of age on the 22nd day of December, 1912.

"That Margaret Wrigley was a sister of the defendant, Robert Wrigley, and that neither Margaret Wrigley nor the defendant, Robert Wrigley were ever married. That they resided upon a farm consisting of some 200 acres of land in Andrew County, Missouri. That the defendant, Robert Wrigley was engaged in farming and conducting a dairy business, and that said Margaret Wrigley was engaged in keeping house for said defendant, and that they lived together as one family.

"That the defendant assumed control of and over the defendant from the time he was first placed in the Wrigley home, and assigned to him all the various and sundry work and labor usual and incident in the operation of a large farm and dairy business, and that plaintiff worked regularly and continuously for said defendant at whatever work was assigned to him."

Plaintiff further alleges:

"That shortly prior to plaintiff's eighteenth birthday, at which times the contract under which plaintiff was placed in the Wrigley home expired, and about the month of November or December, 1912, defendant induced plaintiff to stay on and continue his work and services on said farm by a promise of defendant that he would be given a team and wagon, and a little later defendant induced plaintiff to stay on and continue working said farm until his twenty-first birthday on assurances that defendant would give plaintiff one thousand dollars to enable him to start farming on his own account.

"That shortly prior to plaintiff's twenty-first birthday, and about November, 1915, the defendant advised plaintiff that he and his sister Margaret Wrigley had taken out adoption papers and had legally adopted plaintiff as a son and heir so as to legally protect him and insure his being properly recompensed for his labors, and stated and represented to plaintiff that he was to have an interest in the dairy herd on said farm and that defendant would enlarge said herd and that plaintiff was to manage the farm and furnish the milk which defendant proposed to sell in St. Joseph. That the foregoing statements as of fact and promises so made by defendant to plaintiff, and preparations discussed and undertaken to increase facilities for handling a larger dairy herd, induced plaintiff to rely upon said representations, and to stay on and continue his services to defendant beyond his twenty-first birthday and till on or about the 15th day of July, 1917, when plaintiff was nearing the age of 23, at which time the defendant terminated all his plans with and promises made to plaintiff and discharged the plaintiff with the statement that he was through with him and he could go."

Plaintiff further pleads as follows:

"That during all these years plaintiff believed the statements and representations so made by defendant, and relied and acted thereon, and did not discover the falsity thereof, and did not discover that he was not a legally adopted son of defendant, until he recently learned that defendant had stated to others that he did not adopt plaintiff as a son, whereupon plaintiff caused a check to be made of the records in the office of the register of deeds of Andrew County, which disclosed that no adoption deed was filed for record there.

"That because of the fraud and deceit on the part of defendant as herein mentioned and set forth, and because of the misrepresentations made by defendant to plaintiff and herein pleaded, plaintiff has been damaged in the sum of $1080, as follows: That the reasonable value of his services for the time he worked for defendant from and after his eighteenth birthday, December 22, 1912, to the time of his discharge, July 15, 1917, or a period of fifty-four months is, and was at the time of the rendition of same, $20 per month together with room and board included. That plaintiff is entitled to interest on said sum of $1080 at the rate of 6% per annum from July 15, 1917."

The plaintiff includes in his petition a letter, under date of December 9, 1917, received from defendant. This letter is clearly in answer to a letter from plaintiff to defendant wherein matters of former relations were complained of.

The letter above referred to clearly sets forth defendant's contention as follows:

"In regard to the adoption papers, you may not know that they were not originated by me but the plans were first laid before you for your consideration and were then presented to me. I know of no procedure that either of us could pursue that can undo the relation between father and son. We have divorce laws to separate man and wife but I think you will find that while a son may commit an act that will cause a father to disinherit him, he still continues his son.

"Those adoption papers were made because of our love and affection for you boys at the time they were made and because we wished to protect you in case we were suddenly called to the great beyond. Those papers to me are as sacred as God's own Holy Book because we took oath in His presence to perform the duties of parents and I do not feel capable of asking God to release me from my obligations. Those papers were made with your knowledge and with your written consent, a thing you will find much harder to evade than verbal agreements."

Defendant in his answer makes admissions as follows:

"Comes now Robert Wrigley, the above named defendant, and for his first amended answer, first having obtained leave of court to file the same, admits that plaintiff was a ward of the Children's Aid Society of the City of New York; admits that Margaret Wrigley,

now deceased, was a sister of this defendant; admits that neither this defendant nor his said sister were ever married; admits that in the fall of 1915 the defendant advised plaintiff that he, plaintiff, was adopted by defendant and his said sister, Margaret Wrigley, as their son and heir; admits that in the fall of 1917 plaintiff wrote to this defendant asking payment for four and one-half (4½) years' service; admits this defendant, in answer to said letter from plaintiff, referred to the fact that plaintiff had been adopted and that defendant signed said letter, 'Your Father by Adoption;' admits that this defendant advised the administrator of the estate of Margaret Wrigley that plaintiff was an adopted son of Margaret Wrigley and this defendant, and that said administrator listed plaintiff as a son and heir at law of said Margaret Wrigley, deceased, in his application for letters of administration; admits that plaintiff relied on a contract of adoption.''

After making general denial of matters not admitted, defendant alleges:

''That if plaintiff has a cause of action against this defendant the plaintiff has been guilty of laches in failing to assert such alleged cause of action against the defendant until after a long lapse of time during which defendant's position has been changed in that owing to changed economic conditions, brought about by the so-called years of depression, the defendant's financial *status* has been greatly reduced to such an extent that plaintiff's alleged claim against defendant is inequitable and unjust, and under all the facts and circumstances should not prevail.

''And for further answer and defense to plaintiff's petition defendant states that plaintiff's alleged cause of action, if any, accrued in the year 1917 and is therefore barred by the statute of limitation.''

Plaintiff in his reply states as follows:

''Comes now the plaintiff and for his reply to the first amended answer of defendant herein denies each and every allegation therein contained except such thereof as are admitted in the petition of plaintiff.''

The cause herein was tried at the February Term, 1939, before a jury. The verdict of the jury was for plaintiff and against defendant. Damages were assessed by the jury in the amount of $1080. Judgment was duly entered in accordance with jury verdict.

In due time the defendant filed his motion for a new trial, which motion for a new trial was taken up and sustained by the trial court. From the judgment of the court in granting a new trial, plaintiff duly appealed.

We will continue to refer to appellant as plaintiff and to respondent as defendant.

1124

OPINION.

The trial court assigned as one of the reasons for granting a new trial that it had erred in refusing a directed verdict for defendant. In consideration of this point we proceed upon our conclusion that the plaintiff's cause of action is one in law wherein plaintiff seeks to recover from defendant for services alleged as rendered, to defendant from December 22, 1912, to July 15, 1917.

The plaintiff seeks recovery based upon an action for damages alleged fraud and deceit clearly set forth in his petition, *supra*.

The defendant makes defense that said services were rendered by defendant as a member of the defendant's family, and alleges that as to all matters of adoption that defendant was his adopted son, performing the alleged services as a son and as a member of his family. The defendant makes further defense of laches and also pleads the Statute of Limitations.

The defense of bar by limitation is effective as against plaintiff unless there be facts and circumstances in evidence of fraud practiced upon plaintiff; knowledge of which was neither known to plaintiff or which should have been known by him by use of due care five years before bringing of this suit, to-wit: October 24, 1935.

The plaintiff testified concerning the adoption agreement as follows:

"Just prior to my 21st birthday, while I was still legally a minor, sometime in the month of November, the adoption proposition, adoption papers were brought up and about my becoming adopted, and the idea of developing a large dairy herd, quite a large dairy plant there of which I was to get an interest, and which the adoption papers were to protect this interest until such time as we could make that a going concern. In other words, the adoption papers were rather a guarantee for the years of service I was putting in from 18 onward until this time of earning it. Robert Wrigley first brought up the proposition of increasing that dairy herd and adopting me; he took the first step in everything that is, he was the one that handled all of the business. From the time that I arrived at the age of 18 years, Robert Wrigley directed my services there on the farm. I recollect that Breit & Roberts presented a paper to me to sign and I signed it. It was relative to the adoption papers. I do not know what I signed, I did not read it. I did not read the paper at that time. I do not know whether or not they had executed the adoption deed at that time. I have never seen those papers after that time. Yes, the arrangements by Mr. Wrigley to increase the dairy herd and give me an interest therein, and his representation that he and his sister had adopted me were satisfactory to me at that time. And I continued there on the farm after I arrived at the age of 21 under that arrangement."

Plaintiff further testified:

"I recall no verbal contracts, as referred to by Mr. Wrigley in this letter that were broken by me. There were no other contracts made other than those I have heretofore testified about. At the time I received this letter from Mr. Wrigley, of course, I believed what he said about having been adopted as his son. No, I did not press my claim for payment for services against him after receiving this letter; I never wrote him again. I first got information that led me to believe that I might not have been adopted sometime, I believe, the summer following Margaret's death; she died in the spring; I believe she died in 1934, yes, 1934. I had heard something to the effect that some of the adoption papers had been taken out, but they were not legal because they had not been filed for record, hence there was no adoption. After learning of that I still thought—I thought at the time that could not be so, and I went then on the farm—I was sick at the time Margaret died, I was not up between then, I was sick in bed, so I came up, believe it was in the month of August, and I went to see Robert, and I thought I would talk with him about the situation there, and see if he would mention that I was not adopted, and I asked him on that—I asked him what he thought we had better do with the place. I thought that question would bring out whether I had any rights on the place or not, but at that time he didn't say anything about adoption papers. The only thing he told me then he said the place was not in very good shape. I said, 'Well, Robert, you know I have got quite a stake in there, and I don't want to lose it; I would like to work out something.'"

On cross-examination the plaintiff testified as follows:

"Yes, I knew that the adoption papers had been executed by Mr. Wrigley and his sister, whereby he adopted me, Noah Layer, and the two Anderson boys. I knew of that at the time the papers were being executed. I signed some sort of an instrument consenting to that adoption. I do not recall if that was a letter to the Children's Aid Society of New York and I do not recall if I knew the contents of it. I do not know what became of that document. I don't believe I ever did see the deed of adoption. No, sir, I never read it, they told me it was a deed of adoption and I accepted it. That was executed some little while prior to my 21st birthday. I thought along about the 21st of November, 1915. It could have been October or right about that time. I was 21 in December. My relations between Mr. Wrigley and his sister were friendly and everything was fine at that time. And on up to the time I was 21. I was 21 on December 22, 1915, and I stayed there until July 15, 1917, approximately a year and a half. I remained there in the home in the same situation that I was before the adoption. I had my home there. No charges for board or lodging or anything of that sort. I had clothing, such as they were. I would hate to see some of the shoes I wore then. I had clothing that

I got along with, yes, I got along with them. I did make complaint about it.''

Plaintiff further testified:

''After Maggie's death I came up to see what interest I had in her estate. I went to the Probate Court and found that I had been named as an heir of Maggie. Yes, I alleged in my petition that Robert Wrigley caused me to be named as an heir in her estate, that is right. No one ever disputed that I was an heir to Maggie's estate. We four boys who were named in the deed of adoption went to Sunday School and church in the community. That was usually every Sunday. We went along with Robert and Maggie. I took part in the social life of the community with them to a limited extent, yes, sir.''

The defendant gave testimony in the trial fully corroborating admissions in his answer, *supra*. The defendant placed in evidence the deed of adoption executed October 27, 1915. The deed is duly attested by Notary and shows filing of record as of December 14, 1938. This cause was tried at the February Term, 1939, of the Andrew County Circuit Court.

Prior to 1917 the recognized method of adoption was by deed. The deed of adoption shown in evidence herein is in regular form and duly acknowledged and, while not filed for record until after the commencement of this suit, it fully corroborates the facts proved by the evidence in this case.

The question is raised by defendant in this case that plaintiff's right of action in this case is only enforcible by suit in equity. Defendant's contention in this respect is not tenable for the reason that plaintiff in this suit is not seeking to establish any contract of adoption, but seeks by way of damages to recover from defendant, for services, rendered for alleged fraud perpetrated on plaintiff by misrepresentations concerning such a contract.

We conclude that the evidence in this case is conclusive to the effect that the plaintiff has had such knowledge of all of the transactions touching adoption that, on October 24, 1935, constituted a complete bar to any cause of action seeking to recover from defendant for services rendered from December 22, 1912, to July 15, 1915. The conclusion naturally follows that the trial court committed no error in granting a new trial.

The question as to whether or not the relation of parent and child was shown to exist as between defendant and plaintiff appears to have been treated as a vital issue in the trial below. This gives rise to and we conclude justifies some expressions from us.

The evidence of this case clearly shows a contract for adoption based upon a consideration from plaintiff to defendant, and the defendant in his pleadings herein and under his oath has asserted the fact of adoption.

Judges are human and when sitting as a court, human sentiment often finds expression that when cited meets with the assertion, "*dictum*."

While we realize that *dictum* is not precedent, still when we realize *dictum* has been the inspiration for corrections of former evils, those who read it should not be too harsh in criticism.

The plaintiff in this case is shown to have fully complied with the contract of adoption. There is contained in the letter written by defendant to plaintiff a threat to disinherit plaintiff. It is to be hoped that defendant will not depart from his expression that "those papers to me are as sacred as God's own Holy Book." This leads us to the expression of the thought, that defendant promised to remunerate plaintiff for the services prior to adoption and that those services were merged as an element of consideration for the adoption. Such consideration should place some restriction on disinheritance but, in the language of Kipling, "that is another story."

For reasons stated above, *dictum* excluded, the judgment granting retrial is affirmed. All concur.